## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| ELECTRIC BUFFALO, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:21-cv-02764-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| KUHMUTE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

The following matter is before the court on defendant KUHMUTE, Inc.'s ("Kuhmute") motion to dismiss or, in the alternative, to transfer venue, ECF No. 4. For the reasons set forth below, the court denies the motion.

## I.  BACKGROUND

This contract dispute arises out of a failed business relationship between plaintiff Electric Buffalo, LLC ("Electric Buffalo") and Kuhmute. Kuhmute is a Delaware corporation with a principal place of business in Flint, Michigan. Kuhmute is involved in designing, manufacturing, selling, leasing, installing, and managing fleets of micromobility vehicles and their attendant accessories. In addition to the highly popular electric scooters ("Escooters") and electric bikes ("Ebikes"), micromobility vehicles also include electric wheelchairs, electric skateboards, and delivery robots. While Kuhmute manufactures and sells micromobility vehicles, Kuhmute's "chief product" is its smart charging hub ("Charging Hub"). ECF No. 1-1, Compl. ¶ 8. According to Kuhmute, the Charging Hub is a proprietary technology, designed to be a universal charging station that locks micromobility vehicles in place and charges them until they are used again. Kuhmute designs and manufactures the Charging Hubs in Flint, Michigan.

1

Electric Buffalo, a South Carolina-based limited liability company, identifies and develops opportunities for local businesses and municipalities to implement micromobility vehicle platforms and infrastructure systems in their communities. It operates the day-to-day leasing and rental of micromobility vehicles and supports affiliate partners with fleet management, distribution and requisition of vehicles, and management of operating systems and booking platforms.

Electric Buffalo identified Folly Beach, South Carolina as an ideal community to develop a micromobility vehicle platform and infrastructure system. In 2020, Electric Buffalo began seeking a company that could supply the necessary products and services to successfully launch a platform in Folly Beach. Electric Buffalo contacted a third-party company called Joyride Technologies, Inc. ("Joyride"), who in turn directed Electric Buffalo to Kuhmute. Kuhmute "initiated contact" with Electric Buffalo,[1] and the two companies began discussions and negotiations. ECF No. 5-1, Ezelle Aff. ¶ 6. Eventually, on or around October 27, 2020, the companies entered into a Charging Hub Agreement for Docketed Rideshare Systems (the "Agreement"). Under the terms of the Agreement, Kuhmute was obligated to manufacture and install fifteen double-sided Charging Hubs in Folly Beach. The Charging Hub was "to remain at all times the personal property of KUHMUTE," ECF No. 4-2 at 8 ¶ 8, and Kuhmute retained the "exclusive right to install, operate and maintain the Charging Hub at the Property," id. at

---

[1] The parties dispute which party approached and solicited the other. Compare ECF No. 4-1 ¶ 3 ("Electric Buffalo knowingly approached Kuhmute . . . .") with ECF No. 5 ¶ 2 ("A representative of Joyride . . . directed KUHMUTE to Electric Buffalo. Thereafter, KUHMUTE initiated contact with Electric Buffalo and solicited . . . ."). The court construes the facts in the non-moving party's favor, but in any case, as the court will discuss, this fact is not ultimately dispositive.

7 ¶ 2.  Furthermore, the Agreement stated that Kuhmute was obligated to "obtain any and all necessary federal state or municipal licenses, permits and/or approvals for the installation and operation of the Charging Hub."  Id. at 7 ¶ 3.  Finally, as reflected in the Agreement, Kuhmute intended to send a team to South Carolina to verify site locations for the Charging Hubs.  Id. at 13.  Separate from the Agreement, Electric Buffalo also agreed to purchase thirty used Escooters and their accessories from Kuhmute in January 2021.  As of the date of the complaint, Electric Buffalo has paid for twenty of the Escooters and thirty adaptors.

According to Electric Buffalo, pursuant to the Agreement, it began to pay Kuhmute various deposits under the assumption that Kuhmute was working on building the Charging Hubs as specified.  Electric Buffalo claims that Kuhmute began to "unilaterally change[] multiple material terms of the parties' agreement," like informing Electric Buffalo that it would be required to purchase the Charging Hubs outright, instead of leasing them from Kuhmute.  Compl. ¶ 36.  Electric Buffalo also claims that in or around the first week of March 2021, Kuhmute terminated all communications between the companies.  Around the same time, in March 2021, Electric Buffalo's founder and managing director sent an email to Kuhmute's co-founder and chief executive officer in which he stated that the Agreement "is, in the simplest terms, unenforceable."  ECF No. 4-2 at 16.

On July 22, 2021, Electric Buffalo filed a complaint in the Charleston County Court of Common Pleas against Kuhmute, alleging various theories of breach of contract, as well as conversion, specific performance, and constructive fraud.  Compl.  On August 26, 2021, Kuhmute filed its notice of removal to this court.  ECF No. 1.

On September 2, 2021, Kuhmute filed its motion to dismiss or, in the alternative, to transfer venue. ECF No. 4. Electric Buffalo responded in opposition on September 16, 2021, ECF No. 5, and Kuhmute replied on September 23, 2021, ECF No. 7. On November 2, 2021, the court held a telephonic hearing on the motion. ECF No. 12. As such, the motion has been fully briefed and is now ripe for review.

## II.  STANDARD

### A.  Motion to Dismiss for Lack of Personal Jurisdiction

When a defendant challenges personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction exists. In re Celotex Corp., 124 F.3d 619, 628 (4th Cir. 1997). When the court decides a personal jurisdiction challenge without an evidentiary hearing, the plaintiff must prove a prima facie case of personal jurisdiction. Mylan Labs., Inc. v. Akzo, N.V., 2 F.3d 56, 60 (4th Cir. 1993). "In considering the challenge on such a record, the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." In re Celotex, 124 F.3d at 628 (quoting Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989)). Still, the court need not "credit conclusory allegations or draw farfetched inferences." Masselli & Lane, PC v. Miller & Schuh, PA, 2000 WL 691100, at *1 (4th Cir. May 30, 2000) (quoting Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994)).

### B.  Motion to Transfer Venue

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district . . . where it might have been brought or to any district . . . to which all parties have consented." 28 U.S.C. § 1404(a).

4

The burden is on the moving party to show by a preponderance of the evidence "that transfer to another forum is proper." State Farm Fire & Cas. Co. v. Blanton, 2014 WL 7146980, at *2 (D.S.C. Dec. 15, 2014) (citations omitted). The decision to transfer a case to another venue is "committed to the discretion of the district court," In re Ralston Purina Co., 726 F.2d 1002, 1005 (4th Cir. 1984) (citations omitted), requiring the court to undertake "an individualized, case-by-case consideration of convenience and fairness" and "to weigh in the balance a number of case-specific factors," Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988) (citation omitted).

### III.   DISCUSSION

In its motion, Kuhmute asks the court to dismiss this action for lack of personal jurisdiction and improper venue or, in the alternative, transfer the action to the Eastern District of Michigan. To resolve the jurisdictional challenge, the court must analyze its ability to exercise personal jurisdiction over Kuhmute under South Carolina's long-arm statute and under the Due Process Clause of the Constitution. Because defendants' South Carolina contacts support personal jurisdiction and because subjecting defendants to suit in South Carolina is constitutionally reasonable, the court denies the motion. For similar reasons, the court denies Kuhmute's motion to dismiss for improper venue. Finding dismissal unwarranted, the court next addresses Kuhmute's request to transfer venue. Based on the balance of convenience factors, the court finds that the balance convenience does not favor transfer to the Eastern District of Michigan.

### A.  Motion to Dismiss for Lack of Personal Jurisdiction

In evaluating a challenge to personal jurisdiction, the court engages in a two-step analysis. Ellicott Mach. Corp. v. John Holland Party Ltd., 995 F.2d 474, 477 (4th Cir.

1993).  First, it must find that the forum state's long-arm statute authorizes the exercise of jurisdiction under the facts presented.  Id.  Second, if the statute does authorize jurisdiction, then the court must determine if its exercise of personal jurisdiction is consistent with due process.  Id.  South Carolina's long-arm statute extends its reach to the outer limits allowed by the Due Process Clause.[2]  Foster v. Arletty 3 Sarl, 278 F.3d 409, 414 (4th Cir. 2002).  Consequently, the two-step inquiry compresses into a single question: whether the court's exercise of personal jurisdiction comports with due process.  Sonoco Prod. Co. v. Inteplast Corp., 867 F. Supp. 352, 354 (D.S.C. 1994).

The due process test for personal jurisdiction involves two components: minimum contacts and fairness.  World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291–92 (1980).  Under the minimum contacts test, a nonresident defendant must have certain minimum contacts with the forum state such that the suit does not offend "traditional notions of fair play and substantial justice."  Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. and Placement, 326 U.S. 310, 316 (1945).  Due process is satisfied where the court asserts personal jurisdiction over a defendant who "purposefully avails itself of the privilege of conducting activities within the forum state," Hanson v. Denckla, 357 U.S. 235, 253 (1958), such that it "should reasonably anticipate being haled into court there," World-Wide Volkswagen, 444 U.S. at 297.  Upon a showing of the

---

[2] If the court were to analyze the long-arm statute factors, it would find that they clearly weigh in favor of exercising personal jurisdiction.  Under South Carolina's long-arm statute, the court could explicitly exercise jurisdiction under any of four bases.  These include the exercise of personal jurisdiction as to a cause of action arising from one's (1) "transacting any business in this State;" (2) "contracting to supply services or things in the State;" (7) "entry into a contract to be performed in whole or in part by either party in this State; or" (8) "production, manufacture, or distribution of goods with the reasonable expectation that those goods are to be used or consumed in this State and are so used or consumed."  S.C. Code Ann. § 36-2-803(A).

defendant's purposeful availment, the fairness inquiry balances any burden on the defendant against countervailing concerns such as the plaintiff's interest in obtaining relief and the forum state's interest in the controversy.  Id. at 292.  Personal jurisdiction comes in two forms: general and specific, each of which the court discusses in turn.

General jurisdiction over a corporation exists "when [its] affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State."  Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011).  Subject only to narrow exceptions, a corporate defendant is "essentially at home" in the state under the laws of which it was incorporated and the state in which it has its principal place of business.  Daimler, 571 U.S. at 137.  Kuhmute is a Delaware corporation that maintains its principal place of business in Flint, Michigan.  Although Electric Buffalo claims that Kuhmute had a territory representative who was assigned to South Carolina, this affiliation—on its own—is too attenuated to render Kuhmute "at home" in South Carolina.  As such, Kuhmute is not subject to general jurisdiction here.

Specific jurisdiction, on the other hand, arises when a cause of action is related to the defendant's activities within the forum state.  Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984).  The Fourth Circuit applies a three-part test when evaluating the propriety of exercising specific jurisdiction: (1) whether the defendant purposely availed itself of the privileges of conducting activities in the forum state and thus invoked the benefits and protections of its laws, (2) whether the plaintiff's claims arise out of or relate to those forum-state activities, and (3) whether the exercise of jurisdiction is constitutionally reasonable.  Christian Sci. Bd. of Dirs. of the First Church of Christ v. Nolan, 259 F.3d 209, 215–16 (4th Cir. 2001) (citing Helicopteros, 466 U.S. at

7

414–16; Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 476–77 (1985)).  To show

that the exercise of specific jurisdiction over a defendant comports with due process, a

plaintiff "must prevail on each prong."  Perdue Foods LLC v. BRF S.A., 814 F.3d 185,

189 (4th Cir. 2016).

Electric Buffalo premises its theory for specific jurisdiction on several of

Kuhmute's South Carolina activities related to the Charging Hubs, noting that Kuhmute

"was obligated to perform a majority of its contractual obligations in the State of South

Carolina."  ECF No. 5 at 2.  The court finds that Electric Buffalo has established that the

contacts satisfy each of the three prongs.  With respect to the first prong, Electric Buffalo

must demonstrate that Kuhmute purposefully availed itself to a suit in South Carolina by

deliberately directing activities to the state.  The Fourth Circuit has relied on several

nonexclusive factors to determine whether a defendant has purposely availed itself of a

forum in the context of a business relationship, including:

> (1) "whether the defendant maintains offices or agents in the forum state;"
> (2) "whether the defendant owns property in the forum state;" (3) "whether
> the defendant reached into the forum state to solicit or initiate business;" (4)
> "whether the defendant deliberately engaged in significant or long-term
> business activities in the forum state;" (5) "whether the parties contractually
> agreed that the law of the forum state would govern disputes;" (6) "whether
> the defendant made in-person contact with the resident of the forum in the
> forum state regarding the business relationship;" (7) "the nature, quality and
> extent of the parties' communications about the business being transacted;"
> and (8) "whether the performance of contractual duties was to occur within
> the forum."

Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 560 (4th Cir. 2014)

(quoting Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 278 (4th Cir. 2009)).

The facts put forward by Electric Buffalo indicate that under the first factor,

Kuhmute "initiated contact with Electric Buffalo and solicited" its business.  Ezelle Aff.

¶ 6.  Electric Buffalo also claims that Kuhmute solicited other potential customers in

South Carolina by posting on LinkedIn.  Id. ¶ 10.  Kuhmute vehemently disputes both facts, see ECF No. 4-1 at 3; ECF No. 4-2 at 1, Deppe Aff. ¶ 5; ECF No. 7, Deppe Supp. Aff. ¶ 4, but even if Electric Buffalo had initiated the business relationship, Electric Buffalo presents other facts indicating that Kuhmute directed its activities at the state. For instance, under the fourth purposeful availment factor, Electric Buffalo claims that Kuhmute had a "location map" on its website, and Kuhmute placed a pin in South Carolina with Electric Buffalo's name.[3]  Kuhmute responds that it simply reserved webpages for potential customers but had specifically written that the webpages were "Coming Soon!" because Kuhmute did not have business relationships with any of the customers.  ECF No. 7 at 3.  Even so, the court considers this a factor that hews in Electric Buffalo's favor, as listing South Carolina on its webpage evinces an intent to deliberately engage in long-term business activities in the state.  And under the seventh purposeful availment factor, there is evidence that indicates the parties had detailed discussions about business to be conducted in in South Carolina, even if those included emails about the fallout of the business relationship.  See generally ECF No. 4-2 at 15–29 (attaching email correspondences).  Perhaps most relevant here, under the eighth factor, the performance of contractual duties was largely to occur in South Carolina.  Under the Agreement, Kuhmute made the intentional decision to retain ownership and control over the Charging Hubs in the Agreement once they were in Folly Beach, South Carolina. Since Kuhmute retained the "exclusive right to install, operate and maintain the Charging

---

[3] As additional evidence of purposeful availment, Electric Buffalo also claims that Kuhmute was involved in the development of another micromobility platform in Hilton Head, South Carolina, ECF No. 5 ¶ 8, which Kuhmute fully disputes, ECF No. 7 ¶ 10–11. The court need not resolve this factual dispute because even if Electric Buffalo were correct, under the second prong, its claims do not arise from this alleged contact.

Hub," ECF No. 4-2 at 7 ¶ 2, Kuhmute should have reasonably anticipated being haled into court for issues related to the Charging Hubs. Coupled with the fact that Kuhmute was responsible for obtaining the permits for installation and operation of the Charging Hubs, including from the state or municipal government, the court finds that Kuhmute would likely have had the privileges and protections of South Carolina's laws if a loss, claim, or dispute involving the Charging Hubs would have occurred. In response, Kuhmute argues that its "contractual obligations to collect materials and construct the Hubs and micromobility vehicles were to be performed in Flint, Michigan." ECF No. 4-1 ¶ 3. It further avers that Electric Buffalo volunteered to go to Michigan to pick up the Charging Hubs and vehicles such that delivery was to take place in Michigan. While these may be aspects in which performance of the contract was to occur outside of the forum, it does not discount Electric Buffalo's showing that Kuhmute retained ownership of property (the Charging Hubs) in South Carolina and had continuing obligations to be performed in South Carolina. Those latter facts are particularly noteworthy when gauging whether Kuhmute purposely availed itself of the privilege of doing business in South Carolina.

Kuhmute's other arguments fail to sway the court as well. Kuhmute argues that it "has never set foot in South Carolina," ECF No. 4-1 at 7, but as the Agreement makes clear, Kuhmute would have done so to perform under the contract by inspecting the locations, testing the sites, and installing the equipment. Kuhmute then argues that the Agreement "mentions South Carolina only once," ECF No. 7 at 5 (emphasis omitted), but Kuhmute largely ignores Electric Buffalo's argument that "the Property," as referenced in the Agreement, was clearly referring to the anticipated site in Folly Beach, South

Carolina, ECF No. 5 ¶ 5.  Finally, Electric Buffalo argues that to the extent the "site

location information" in the Agreement could be read as referring to South Carolina, it

was ultimately left blank and the Agreement "does not contain a time-is-of-the-essence

clause" or an integration clause—implying that the Agreement could have later been

performed somewhere other than South Carolina.  See ECF No. 7 at 5.  The court is

unconvinced by Kuhmute's attempt to escape the plain meaning of the Agreement based

on a technicality.  The uncontroverted evidence is that Kuhmute knew "Electric Buffalo

claimed that it intended to install the Hubs in Folly Beach, South Carolina."  ECF No. 4-2

at 2, Deppe Aff. ¶ 15.  Therefore, Electric Buffalo has demonstrated that when Kuhmute

entered into the Agreement, it purposely availed itself of the privileges of conducting

activities in South Carolina.

      With respect to the second prong of the specific jurisdiction test, given that the

court has found that Kuhmute purposely availed itself of the forum state, the court must

examine whether the Electric Buffalo's claims arise from or relate to the connections

constituting purposeful availment.  This prong is satisfied if the "activity in the forum

state is the genesis of [the] dispute," or "if substantial correspondence and collaboration

between the parties, one of which is based in the forum state, forms an important part of

the claim."  Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co., Ltd., 682

F.3d 292, 303 (4th Cir. 2012) (alteration in original) (citations omitted).  Additionally, the

Supreme Court recently clarified that the second prong of the specific jurisdiction inquiry

does not "require proof of causation."  Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 141

S. Ct. 1017, 1026 (2021).  In other words, a plaintiff need not show that her claim "came

about because of the defendant's in-state conduct."  Id.  Instead, the specific jurisdiction

11

test is more expansive, supporting a court's exercise of jurisdiction over an out-of-state

defendant where that defendant's in-state contacts "relate to" the plaintiff's claim. Id.

(emphasis in original). Even so, the Supreme Court made clear in Ford that not every

connection between a plaintiff's claim and defendant's contacts will do. Id. "[T]he

phrase 'relate to' incorporates real limits, as it must to adequately protect defendants

foreign to a forum." Id. At bottom, specific jurisdiction requires a direct, meaningful

connection between the defendant's forum-state contacts and the plaintiff's claim.

Bristol-Myers Squibb Co. v. Super. Ct. of Cal., 137 S. Ct. 1773, 1781 (2017). In

determining whether such a connection exists, the court should "direct [its] focus to the

quality and nature of [the defendant's] contacts." Carefirst of Md., Inc. v. Carefirst

Pregnancy Ctrs., Inc., 334 F.3d 390, 397 (4th Cir. 2003).

     Here, the dispute arises out of Kuhmute's contract with a South Carolina entity,

who intended the Charging Hub central to the Agreement to be installed in South

Carolina. Accordingly, the facts discussed in relation to the first prong regarding the

performance under the Agreement are all clearly connected to the issues raised in this

action. The court finds that the Agreement has a substantial connection to South Carolina

because under the terms of the Agreement, Kuhmute contracted to perform several duties

in Folly Beach, South Carolina.

     Perhaps recognizing that the Agreement contains several obligations that

Kuhmute would have to perform in South Carolina, Kuhmute argues that Electric

Buffalo's appeal to the Agreement is "disingenuous" because Electric Buffalo had stated

that the Agreement is unenforceable. ECF No. 7 at 1 (citing ECF No. 4-2 at 16). The

court disagrees. First, the reference to the contract's purported unenforceability is from

an email written by Electric Buffalo's founder and managing director.  See ECF No. 4-2 at 17.  While this evidence may support Kuhmute's substantive defense of repudiation, it is not dispositive under the jurisdictional inquiry.   The court must rely on Electric Buffalo's complaint to determine whether plaintiff's claims arise out of or relate to the forum-state activities.  As Kuhmute concedes, Electric Buffalo's complaint is most plainly read as a breach of contract claim.  See ECF No. 4-1 ¶ 4 ("Electric Buffalo claimed the Charging Hub Agreement—which it now seeks to enforce by way of the instant Complaint . . . .").  Courts have routinely found that breach of contract claims arise from or relate to the act of entering the contract at issue and that the exercise of specific jurisdiction over a defendant-party to the contract is proper in connection to those claims.  See Choice Hotels Int'l, Inc. v. Madison Three, Inc., 23 F. Supp. 2d 617, 621 (D. Md. 1998) (holding that the plaintiff's claim that the defendant breached a franchise agreement meant the claim arose directly from the defendant entering the contract, and the court had specific jurisdiction over the defendant); Ramada Franchise Sys., Inc. v. Hanna Hotel Enters., LLC, 147 F. Supp. 2d 840 (N.D. Ohio 2001) (finding that in a case where the plaintiff claimed that the defendant breached a contract, litigation directly arose from that contract, justifying specific jurisdiction over the defendant). Second, even if Electric Buffalo had disclaimed the contract, Kuhmute ignores that its contacts with the forum state are not limited to the act of negotiating and entering into the Agreement with Electric Buffalo, but rather are further reflected in Kuhmute's intent to actually perform in South Carolina.  Accordingly, the court finds that this second prong is satisfied.

In assessing the third prong of constitutional reasonableness, the court "ensures that litigation is not so gravely difficult and inconvenient as to place the defendant at a severe disadvantage in comparison to his opponent." Tire Eng'g & Distrib., 682 F.3d at 303 (citation omitted). The court's inquiry is guided by the "burden on the defendant, interests of the forum state, and the plaintiff's interest in obtaining relief." Id. (citation omitted). However, "[a] corporate defendant's domicile abroad, standing alone, does not render domestic exercise of jurisdiction unduly burdensome." Id. (citation omitted).

The court finds that the exercise of personal jurisdiction over Kuhmute is constitutionally reasonable. Although Kuhmute—a Delaware corporation principally located in Michigan—faces a burden litigating in South Carolina in comparison to Electric Buffalo—a South Carolina limited liability corporation—this fact is not dispositive. Indeed, Kuhmute has secured local counsel to defend it in this litigation. There are other certainly other convenience factors to consider, but as the court will discuss infra, none of those factors weigh in Kuhmute's favor such that the exercise of personal jurisdiction would be constitutionally unreasonable. In sum, the court finds that Electric Buffalo has established the third prong for specific jurisdiction, and overall, the court has personal jurisdiction over Kuhmute.

### B. Motion to Dismiss for Improper Venue

In the alternative, Kuhmute argues that venue is improper and asks that the court dismiss the matter pursuant to Federal Rule of Civil Procedure 12(b)(3). A party may move to dismiss a matter for "improper venue." Fed. R. Civ. P. 12(b)(3). The question of whether venue is "improper" in a civil case is governed by 28 U.S.C. § 1391(b), which states that a civil action may be brought in:

14

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

For the purposes of venue, a business entity is "deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." 28 U.S.C. § 1391(c)(2).

The court has determined that Kuhmute is subject to personal jurisdiction in South Carolina with respect to this action. Therefore, for the limited purposes of § 1391, Kuhmute is deemed to reside in South Carolina. Thus, venue is proper in the District of South Carolina under § 1391(b)(1). Kuhmute argues that venue is improper under § 1391(b)(2) because a substantial part of the events that gave rise to Electric Buffalo's claims occurred in Michigan, rather than in South Carolina. But finding that venue is proper under § 1391(b)(1), the court need not consider § 1391(b)(2). Therefore, the court denies the motion to dismiss for improper venue because the current venue is proper.

### C. Motion to Transfer Venue

Finally, Kuhmute argues that "[a]t the very least, this case should be transferred to the Eastern District of Michigan" pursuant to 28 U.S.C. § 1404. ECF No. 4-1 at 8. As previously discussed, to determine whether to transfer a case to another venue, the court must consider the "convenience and fairness" of either retention or transfer of the case

and "to weigh in the balance a number of case-specific factors." Stewart Org., 487 U.S.
at 29. The factors "commonly considered" are:

> (1) the ease of access to the sources of proof; (2) the convenience of the
> parties and witnesses; (3) the cost of obtaining the attendance of the
> witnesses; (4) the availability of compulsory process; (5) the possibility of
> a view by the jury; (6) the interest in having local controversies decided at
> home; and (7) the interests of justice.

Atkins v. Mortara Instrument, Inc., 2017 WL 10754250, at *2 (D.S.C. Sept. 29, 2017)

(citations omitted). The court examines each of the factors[4] in turn.

### 1. Ease of Access to Sources of Proof

Kuhmute contends that "information pertaining to Kuhmute's negotiations and

discussions with Joyride, the bike-share management system company that Kuhmute was

working with to develop Electric Buffalo's app platform, are all located in Michigan."

ECF No. 4-1 at 10   However, Kuhmute does not argue that the negotiations with Joyride

are part and parcel with Kuhmute's negotiations with Electric Buffalo. In fact, at the

hearing, both parties acknowledged that Joyride was not involved in negotiations between

Kuhmute and Electric Buffalo. Kuhmute also claims repeatedly that "Kuhmute

negotiated with Electric Buffalo in Michigan." Id. at 10. See also ECF No. 7 at 9

("Kuhmute negotiated the Charging Hub Agreement in Michigan."). But the parties

stated at the hearing that the Agreement was negotiated electronically—meaning only

Kuhmute negotiated from Michigan—not that the negotiations actually took place in

Michigan.

---

[4] The parties provide different formulations of the balance of convenience factors,
but the court is able to identify each party's arguments and apply them to the factors
listed in Atkins.

Kuhmute's most compelling argument here is that "[i]f Kuhmute possessed raw materials to assemble the Hubs, those materials were in Michigan."  ECF No. 4-1 at 10 (citing ECF No. 4-2 at 3, Deppe Aff. ¶ 13).  However, Electric Buffalo suggests that Kuhmute has not made much progress, if any, on building the Charging Hubs, which would mean that there would be no such evidence to view.  Compl. ¶ 26.  In any case, this case appears to arise out of a dispute over the terms of the contract, not the quality of the goods to be delivered by Kuhmute.  Therefore, the court finds that the most pertinent and relevant information is related to the contract negotiations and course of performance.  The court anticipates—based in part on the evidence that has already been presented—that such documents will easily be subject to electronic discovery.  See McNeil v. Sherman, 2009 WL 3255240, at *8 (D.S.C. Oct. 7, 2009) ("[T]he location of documents has become a less significant factor as technological advances make the copying, storage, and transfer of documents easier."); accord Montoya v. CRST Expedited, Inc., 285 F. Supp. 3d 493, 501 (D. Mass. 2018) (finding that in the modern age, "digital documents are just a click away [and] [a]ccordingly, this factor does not weigh in favor of either party").  As a final consideration, Electric Buffalo alleges in its complaint that it invested in numerous other micromobility vehicles made by other companies to be used with the Charging Hubs, in reliance on the Agreement.  Compl. ¶ 34.  This fact is material to Electic Buffalo's claim of reliance damages, and according to Electric Buffalo, any evidence about the micromobility vehicles it invested in from other companies would be found in South Carolina.  The sources of proof factor is therefore neutral, at best, for Kuhmute.

### 2.  Convenience of the Parties and Witnesses

Kuhmute argues that the convenience of the witnesses is often dispositive in transfer cases.  And, as Kuhmute observes, "[n]o matter which forum is selected, one side or the other will be burdened with bringing themselves and their witnesses from far away."  ECF No. 4-1 at 9 (quoting Brock v. Entre Comput. Ctrs., Inc., 933 F.2d 1253, 1258 (4th Cir. 1991)).  However, Kuhmute fails to mention that in such circumstances, courts have found that "transfer is inappropriate as it would 'serve only to shift the balance of inconvenience.'"  JTH Tax, Inc. v. Lee, 482 F. Supp. 2d 731, 737 (E.D. Va. 2007) (quoting Bd. of Trs., Sheet Metal Workers Nat. Fund v. Baylor Heating & Air Conditioning, Inc., 702 F. Supp. 1253, 1258 (E.D. Va. 1988)).  Therefore, Kuhmute's assertion that it intends to call its own chief executive officer and another employee is unpersuasive as transfer would only shift the inconvenience onto Electric Buffalo's employees who would have to travel to testify.  Kuhmute additionally argues that witness convenience favors transfer because the witnesses with knowledge of Kuhmute's negotiations and discussions with Joyride are all located in Michigan.  This may certainly be relevant, as "the convenience of non-party witnesses should be afforded greater weight in deciding a motion to transfer venue."  comScore, Inc. v. Integral Ad Sci., Inc., 924 F. Supp. 2d 677 (E.D. Va. 2013) (quoting Samsung Elecs. Co., Ltd. v. Rambus, Inc., 386 F. Supp. 2d 708, 718 (E.D. Va. 2005)).  But Electric Buffalo concedes, in the same breath, that Joyride is located in Canada.  ECF No. 4-1 at 11 n.1.  For purposes of transfer, Michigan may be slightly more convenient but is not decidedly so, as both venues will face similar issues with compelling the appearance of witnesses from a foreign country. Moreover, as the court has already discussed, Kuhmute has failed to explain the

significance of Joyride's testimony to the instant action, which further diminishes the importance of this factor.  See Sw. Equip., Inc. v. Stoner & Co., Inc., 2010 WL 4484012, at *5 (D.S.C. Nov. 1, 2020) (citation omitted) ("[C]ourts should accord greater weight to witnesses whose testimony is central to a claim and whose credibility is also likely to be an important issue . . . .").  Therefore, this factor is neutral.

### 3.  Cost of Obtaining the Attendance of Witnesses

For the same reasons that the convenience of the parties and witnesses factor is neutral, the cost of obtaining attendance of witnesses likewise is neutral.

### 4.  Availability of Compulsory Process

Because the only third-party witnesses allegedly involved are Joyride's employees, who are outside the country, the parties will likely encounter the same difficulties in compelling attendance at depositions, hearings, and trial.  Accordingly, this factor is neutral with respect to venue.

### 5.  Possibility of a View by the Jury

Neither party has represented that the merits of this case should be decided, even in part, based on an on-site visit by the jury.  As such, the factor does not weigh in either party's favor.

### 6.  Interest in Having Local Controversies Decided at Home

Kuhmute validly points out that the Agreement contains a choice of law provision specifying that Michigan law will apply.  ECF No. 4-1 at 11.  It argues, in turn, that "[c]ourts in South Carolina have no interest in having the matter decided locally," while transfer would avoid "unnecessary conflict of law problems."  Id.  While the choice of law provision may weigh in Kuhmute's favor, it only does so minimally.  To be sure, the

court must look to give effect to the party's choice of law, but there is no reason why this court—if it finds that Michigan law applies[5]—cannot ably apply Michigan law.  In any case, the court must also consider that Electric Buffalo has a "substantial concern in seeking relief in the state in which its business operates and where it is suffering economic injury."  Milliken & Co., Inc. v. Reynolds, 2012 WL 5354399, at *8 (D.S.C. Oct. 26, 2012); see McNeil, 2009 WL 3255240, at *8 ("South Carolina has a local interest in providing a forum for South Carolina residents to seek redress for injuries caused to them by out-of-state defendants.").  Finally, in evaluating this factor, "[c]ourts have determined that litigation should take place in the federal judicial district or division with the closest relationship to the operative events."  Brown v. Sullivan, 2015 WL 12815281, at *3 (D.S.C. Mar. 3, 2015) (internal quotations and citation omitted).  For reasons that the court discussed in the context of its specific jurisdiction analysis, the court finds that South Carolina has the closest relationship to the controversy.  Therefore, the court finds that this factor weighs against transfer.

### 7.  Interests of Justice

The court uses a holistic approach to analyze this factor, "focusing on issues such as preserving judicial economy and conserving judicial resources."  Sw. Equip., 2010 WL 4484012, at *5 (citation omitted).  Although this case may arise under Michigan law, it was initiated in South Carolina, and the court finds that judicial resources would be most

---

[5] The court may ultimately determine that the choice-of-law provision is unenforceable.  See Nucor v. Bell, 482 F. Supp. 2d 714, 728 (D.S.C. 2007) (citations omitted) ("Generally, under South Carolina choice of law principles, if the parties to a contract specify the law under which the contract shall be governed, the court will honor this choice of law . . . . However, a choice-of-law clause in a contract will not be enforced if application of foreign law results in a violation of South Carolina public policy.").

efficiently utilized by retaining jurisdiction. Kuhmute argues that the court should also consider court congestion as a public interest factor, noting that the District of South Carolina has a "growing docket" while the Eastern District of Michigan has a "declining docket." ECF No. 4-1 at 11 n.2 (citing federal judicial caseload statistics 2020 tables). However, in the court's estimation of the available judicial resources, there is no reason that this court is ill-equipped to hear the case.

Having applied the § 1404(a) factors, the court finds that Kuhmute has not carried its burden of showing that this case should be transferred to the Eastern District of Michigan. At best, most of the factors—including access to sources of proof, convenience of the parties and witnesses, and costs of obtaining witnesses—are neutral. As a result, Electric Buffalo's choice of venue ultimately proves to be determinative, and the court will not interfere with Electric Buffalo's choice. Accordingly, the court denies Kuhmute's motion to transfer venue.

## IV.   CONCLUSION

For the reasons set forth above, the court **DENIES** the motion in its entirety.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**November 30, 2021**
**Charleston, South Carolina**